No. 28,554.

The Kansas Wheat Growers Association, *Appellant*, v. J. B. Garnett, *Appellee*.

(278 Pac. 5.)

Opinion filed June 8, 1929.

. *T. A. Noftzger, George W. Cox, Lawrence Weigand* and *Scott Pfuetze,* all of Wichita, for thè appellant.

*William Keith* and *Lester Wilkinson,* both of Wichita, for the appellee.

The opinion of the court was delivered by

Harvey, J.: This is an action by a coöperative marketing association organized under R. S. 17-1601 *et seq.* against one of its members for damages, at 25 cents per bushel, as stipulated in the membership agreement, for wheat alleged to have been grown or produced by him in the years 1922 to 1925, inclusive, and not delivered to the association. The jury found for plaintiff as to wheat produced in 1922, and as to this no question is now raised. It was defendant's contention that he quit farming wheat after the harvest of 1922 and leased his farm to his son, nineteen years of age, for a cash rent of $1,500 per year. Issues were joined on this contention as to whether it was in good faith, or was it subterfuge by which defendant sought to evade carrying out his contract with plaintiff. The jury, in answer to special questions, found that the lease was made in good faith and that defendant produced no wheat in the years 1923, 1924 and 1925. These findings were approved by the trial court and judgment rendered accordingly, and the plaintiff has appealed.

Appellant argues that the defendant could control the wheat produced on his land in the years 1923, 1924 and 1925, and in support of that cites the case of *Burley Tob. Growers' Coöp. Assn. v. Devine,* 217 Ky. 320. In that case a member of the association, who had become dissatisfied with his contract, was a tenant growing tobacco on land owned by another. He had the lease for the year in question made to his daughter, who in fact was working away from home. She did nothing in the way of growing or harvesting the crop nor employing persons for that purpose. The court very properly held that the lease made in her name was only a device by which defendant sought to avoid carrying out the marketing agreement. Appellant also cites *Oregon Growers, etc., Assn. v. Lentz,* 107 Ore. 561, in which the member had contracted to deliver loganberries grown by him to the association. He became dissatisfied with the association and one year declined to deliver berries grown on his land. When sued he pleaded that, being in poor health, he had leased his premises to his eighteen-year-old son under an agreement that the son should cultivate the place, sell the products, pay all expenses, and divide the profits equally with the father. Under the facts disclosed by the evidence in that case the trial court held that the transaction did not relieve defendant from his obligation

to deliver berries to the plaintiff in accordance with his contract. Appellant also cites *Main v. Texas Farm Bureau Cotton Ass'n*, 271 S. W. 178 (Tex. Civ. App.). There the member of the association was the landowner. He made a contract with a tenant to grow cotton on his land and to pay as rent one-fourth of the cotton raised, but that the tenant should sell the cotton and pay him the money received for it. The court held that this did not relieve the landlord from his obligation to sell the one-fourth of the crop to the association. In the opinion it was said:

"The contract by defendant with his tenants was not what is known as a money-rent contract—a contract stipulating certain money rent, regardless of the crop raised—but is a part-crop contract in which the rent received is to be measured by one-fourth of the crop produced. The landlord's interest was in the crop, and the fact that he authorized his tenant to sell his part and give him the money does not change the status of that interest." (p. 179.)

Appellant also recites *Feagain v. Dark Tobacco Growers' C. A.*, 202 Ky. 801 (followed in *Dark Tob. Growers' Coöp. Assoc'n v. Daniels*, 215 Ky. 67), where it was held that the landlord had power to control delivery of agricultural products raised by his tenants. But the ruling in this case was based on the Kentucky statute (Acts 1922, ch. 1, § 18 [c]), which provides in substance that a landlord is conclusively presumed to have the power to control delivery of crops grown on his land; and in the opinion it was said:

"It was within the power of the legislature to provide a rule of conclusive presumption on the question of the landlord's power to control the delivery of the products (*Young v. Duncan*, 218 Mass. 346, 106 N. E. 1), and, as a conclusive presumption cannot be overcome by contrary proof, the effect of the provision is to put it out of the power of either the landlord or the tenant to plead or prove any fact tending to show that the landlord did not have such control." (p. 803.)

We have no such provision in our statute, hence the citation is not in point. We note, however, in that case the member had leased his land for a share of the crop. The tenant was willing to deliver his share to the association. It was the landlord who was refusing to deliver his share.

In this case the defendant was required to deliver to the association the wheat grown by him within the term of his contract. But he was not required to continue growing wheat. He could quit growing wheat if he wished to do so and raise other crops, and there is nothing in his contract to prevent him from leasing his land for cash rent. The question whether such lease was a device or

subterfuge to avoid his carrying out his agreement with the association is largely a question of fact. (*Kansas Wheat Growers Ass'n v. Lucas,* 124 Kan. 773, 775, 262 Pac. 551.) If the pretended leasing was such a device or subterfuge, the member would be liable to the association to the same extent as though he had grown the wheat himself, but if it were in fact a leasing in good faith for a cash rent, he would not be so liable.

It is argued that the finding of the jury that the lease was made in good faith is not supported by the evidence. The points urged on that might well have been, and no doubt were, urged before the jury in the trial court. It was a situation to be scrutinized with care, and the court so instructed the jury. We examine the question only so far as to see whether there was evidence sufficient to support the finding and judgment. The evidence disclosed that the defendant was a man advanced in years. His wife was not living. He had suffered a heat stroke which to a large extent incapacitated him from conducting the farm. He had a son, almost grown, who was willing to work and to take over the farming operations, and apparently ambitious to be an intelligent, successful farmer. The son leased the land, procured machinery and put out the crop, attended the Agricultural College at Manhattan two short terms, was home, and harvested and cared for the crop. It is true the father did do a little work in connection with this crop, and the son used some of the father's machinery. It is also true that one year when the crop was rather poor he paid only $1,200 instead of $1,500 as rent, and one year when the crop was better than usual he paid $1,600. But these are all questions that go to the good faith of the transaction. Had the jury found the other way there would have been evidence to support the findings. But it did not so find. It is the function of the jury and the trial court, who saw and heard the witnesses, to weigh their evidence.

Appellant suggests that defendant could not make this contract with his son because the son was a minor. But this suggestion has no substantial merit. Perhaps the minor could have avoided the contract because of his minority, but there is no intimation in the evidence that he attempted to do so, and it is not for that reason invalid as a matter of law.

Finding no error in the record, the judgment of the court below is affirmed.